UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Maria Giamundo, Laura Leone,
Deborah Worrell and Evelyn Singer,

                              Plaintiffs,      CV-03-5245 (CPS)


   - against -                                 MEMORANDUM OPINION
                                               AND ORDER


Marilyn Shevell, Robert Brevetti,
Martin Blum and New York City Board
of Education,

                              Defendants.

----------------------------------------X


SIFTON, Senior Judge.



        Plaintiffs Maria Giamundo ("Giamundo"), Laura Leone

("Leone"), Deborah Worrell ("Worrell"), and Evelyn Singer

("Singer") bring this action against defendants the New York City

Board of Education ("Department of Education"), Marilyn Shevell

("Shevell"), Martin Blum ("Blum") (collectively, the "City

Defendants"), and Robert Brevetti ("Brevetti") pursuant to Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e

et seq. ("Title VII"), 42 U.S.C. § 1983, the New York State Human

Rights Law, New York Executive Law §§ 296 and 297 ("NYSHRL"), and

the New York City Human Rights Law, N.Y.C. Administrative Code

§8-101 et seq. ("NYCHRL"). Plaintiffs allege that defendants

discriminated against them by creating a hostile work environment based on their gender and retaliated against them for complaining about sexual harassment and their hostile work environment. Plaintiffs Worrell and Leone also claim that they were constructively discharged.[1]

Presently before the Court are defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant Brevetti moves for summary judgment, arguing: (1) plaintiffs cannot recover against Brevetti under Title VII; (2) there is no genuine issue of fact on which to sustain the § 1983 claims; and (3) plaintiffs' state law claims should either be dismissed or the Court should decline to exercise jurisdiction over them. The City Defendants move for summary judgment, claiming: (1) plaintiffs cannot establish a prima facie case of hostile work environment based on their gender; (2) plaintiffs cannot establish a prima facie case of retaliation; (3) plaintiffs cannot maintain their § 1983 claims against City defendants as a matter of law; (4) plaintiffs Title VII claims against the individual defendants cannot be maintained as a matter of law; (5) plaintiffs Worrell and Leone cannot establish an action for constructive discharge as a matter of law; and (6) plaintiff Giamundo cannot establish an action for defamation

---

[1] Plaintiff Giamundo also asserted a cause of action for defamation against defendants Blum and Shevell; however, by letter dated March 28, 2006, plaintiff withdrew this claim.

against defendants Blum and Shevell as a matter of law. For the reasons that follow, the motions for summary judgment are granted in part and denied in part.

**BACKGROUND**

The following facts are taken from the parties' depositions, affidavits, exhibits, and Local Rule 56.1 statements. Disputes are noted.

Plaintiff Giamundo, during all relevant times, was a school secretary at Martin Van Buren High School ("Van Buren"). She was appointed school secretary in September 1991. Before that, she served as a school aide at Van Buren. Plaintiff Laura Leone began work as a school secretary at Van Buren in 1997. From November 2000 to September 2001, she was on unpaid leave of absence to care for a family member, after which she returned to work as a school secretary. Before commencing work as a school secretary at Van Buren, Leone served as a school secretary and teacher in other schools. Plaintiff Singer began working at Van Buren in 1994 as a substitute school secretary. She was appointed a full time secretary in 1996. Plaintiff Worrell started work as a paraprofessional in the English Department at Van Buren in 1989.

Defendant Robert Brevetti was assigned to Van Buren in September 1998 as Assistant Principal of Operations. He had supervisory authority over the secretarial staff until November 2002. Defendant Marilyn Shevell was appointed Principal of Van

Buren on February 1, 2002. Defendant Martin Blum was a consultant
hired by the Superintendent's Office to consult with Shevell
regarding the sexual harassment complaints made by plaintiffs.

### Plaintiff Giamundo's Contacts with Defendants Brevetti and Shevell

After Brevetti was assigned to Van Buren in 1998, he worked
with Giamundo on a daily basis, and enjoyed a good working
relationship with her until Fall 2001, at which point Giamundo
alleges their relationship changed. In October 2001, Giamundo
called Brevetti to ask him a question. He answered "blow me" and
hung up the telephone. Throughout the course of that month,
Brevetti said "blow me" or "eat me" to her on numerous occasions,
and, after making such comments, laughed. Brevetti admits that he
used sexually offensive terms in speaking with Giamundo, but not
those attributed to him and no more frequently than five times in
October 2001. Giamundo says it happened more often. She told
Brevetti to stop, but initially did not tell anyone else about
the comments.

Giamundo alleges that her relationship with Brevetti was
again "fine" between November 2001 and February 2002. Giamundo
states that in the Spring of 2002, she went to Principal
Shevell's office to ask Brevetti a question and, in front of
Shevell and two other administrators, Brevetti again said "blow

me," laughed, and that Shevell also laughed.[2] She states that
after this incident, Brevetti continued to direct the words "blow
me" to Giamundo on almost a daily basis, and when she asked him
to stop, laughed. When, in May 2002, Brevetti once again said
"blow me" to Giamundo, she became very angry while he again
laughed. Later that day, Giamundo states, Brevetti returned to
her office and gave her a lewd note written in Italian that said
that "he wanted to do her" and "what he wanted her to do with her
mouth."

The following morning, Giamundo complained to Shevell about
Brevetti's behavior, and Shevell told Giamundo that she would
"absolutely do something." Approximately half an hour later,
Brevetti is said to have accosted plaintiff in her office and
angrily told her that the principal would never support her over
him, and that she should "blow him." After that, Brevetti's
behavior toward plaintiff became "nasty and curt."

In June 2002, Giamundo and Leone were working in the payroll
office on a document which required Brevetti's approval. Giamundo
went to the principal's office to get him. He did not respond to
her request to approve the document, so she returned to payroll
and informed Leone. Leone went to the principal's office, and

_____

[2] According to Brevetti's Response to Plaintiff's Rule 56.1 Statement,
Brevetti "denies, as he previously has denied, ever having said any of the
things attributed to him by the plaintiffs generally and Maria Giamundo in
particular..., and for the same reasons Brevetti denies that anyone could have
witnessed such an incident."

when she returned to payroll, she informed Giamundo that Brevetti
would be there in a minute. Brevetti then entered the payroll
office and began yelling at Giamundo while walking towards her
until her back was against the radiator. He physically pressed
her against the radiator and pressed his chest against her chest.
Leone told Brevetti to stop, at which point Brevetti walked out
of the office, slamming the door behind him when Leone attempted
to follow him. Later, Brevetti returned to the office and began
screaming at Giamundo again, this time with both Leone and
Shevell present. Leone and Shevell told Brevetti to stop.
Brevetti left the office but returned a few minutes later to
approve the document. Defendant Brevetti denies that this
incident occurred.

     The next day, Giamundo wrote a letter to Shevell about the
incident. Although Shevell was present for part of the incident,
Giamundo recounted the entire incident in the letter and
requested that the "situation [be] addressed."

     On September 3, 2002, after returning to work following
summer recess, Giamundo learned that Leone would no longer be
working in the payroll office. She complained to her United
Federation of Teachers (UFT) representative and was told that
nothing could be done. Giamundo did not complain to Shevell at
that time.

     On September 4, 2002, Brevetti once again yelled at

Giamundo, this time because she had asked school aides to inquire about checks. He leaned toward her over her desk in the payroll office and pounded on her desk while doing so. As a result of this incident, Giamundo began to feel sick. She was taken to the school's medical room, and then taken by ambulance to the hospital, where she was treated for trauma.

After this incident, Brevetti no longer made comments such as "blow me" or "eat me" to Giamundo; however, Giamundo alleges that Brevetti, along with the other Assistant Principals, were "nasty and performing actions to put her in her place."

On September 6, 2002, Giamundo was contacted by Don Nobles, the UFT Chapter Leader for secretaries at the school. He informed Giamundo that some of the secretaries were going to be excessed,[3] and he asked her if she would volunteer to be excessed. Giamundo refused.

On September 9, Giamundo filed a grievance and a letter to Shevell about Brevetti's "inappropriate, unprofessional, harassing, and physically threatening behavior" on September 4, 2002. In the letter, she stated that Shevell largely ignored her on that day, even though she was in obvious physical and emotional distress, and accused Giamundo of lying to the EMS technician about her physical health. On September 10, Giamundo

---

[3]The parties agree that excessing "is a procedure by which school personnel are removed, against their will, to another building, usually because they are not needed."

filed a grievance objecting that Shevell had created a new secretarial position and filled it without posting an announcement as required.

On September 20, 2002, Shevell addressed Giamundo's grievances. First, she eliminated the new secretarial position. With respect to the grievance concerning Brevetti's behavior, Shevell advised Giamundo to file a complaint with Adrienne Brown, the Local Equal Opportunity Coordinator ("LEOC") for Van Buren. Shevell gave Giamundo a copy of Chancellor's Regulation A-830, which outlines the procedures for employee complaints of sexual harassment.

On October 4, 2002, Giamundo made a formal complaint of discrimination to the Office of Equal Opportunity ("OEO") at the Department of Education ("DOE") alleging sexual harassment and retaliation by Brevetti and Shevell.

Brevetti was removed from Van Buren and replaced by Assistant Principal Celeste Burgess in November 2002.

Giamundo alleges, and Brevetti disputes, that the assistance she had been receiving in the payroll office, along with some of the furniture, had been removed by Brevetti at some point prior to his departure in order to harass her. On November 6, 2002, Giamundo complained to Shevell that she needed additional assistance and furniture for the office. The next day, Assistant Principal ("AP") Burgess informed Giamundo that Shevell had

approved assistance for Giamundo in distributing pay checks as well as the provision of additional furniture.

On November 22, 2002, Giamundo filed a grievance complaining that her assistance and furniture were removed in retaliation for her sexual harassment complaints. Following a December 13, 2002 meeting with UFT representative Rona Freiser, AP Burgess again informed Giamundo that the administration would provide her with assistance and additional furniture as requested. Despite these assurances, Giamundo alleges, she did not get the assistance she needed.

In January 2003, Giamundo learned that she was to be excessed from Van Buren. She filed a grievance, but Shevell denied the grievance. Giamundo alleges that her removal was conducted in a humiliating manner in front of other staff members. She was told that her work in the payroll office would be investigated, although she was not accused of anything specific, and that she would have to remove her personal effects while Nobles was present. Once she had her personal belongings together, defendant Blum searched everything.

As a result of being excessed to another school, Giamundo lost her seniority and per session (or overtime) work. Because she was under investigation, her clearance to use the payroll computer was revoked. After her removal, she wrote a letter to Shevell reminding her of her right to return to her job under

union rules if a secretarial position opened in Van Buren.
Shortly after Giamundo was excessed, Leone left her position and
then two other secretaries left their positions; however, no new
secretaries were hired until after Giamundo's right to return had
expired.

Plaintiff Leone's Contacts with Defendants Brevetti and Shevell

When Principal Shevell arrived at Van Buren in February
2002, she determined that she did not need two secretaries and
assigned Leone to the payroll office. Leone worked in the payroll
office for the Spring 2002 school term.

Leone testified that in May 2002, while in the payroll
office with Leone, Brevetti put a microphone down his pants so
that it looked like an enlarged penis and pointed to it in order
to call her attention to it.

Leone also testified that she witnessed the June 2002
incident between Brevetti and Giamundo. After the incident, she
spoke to UFT Representative Nobles, who informed her that she
could file a grievance about the incident.

As of Fall of 2002, Leone alleges that she had been given
five different assignments in four years. On September 4, 2002,
she filed a grievance requesting a written promise that she would
not be moved from her then current position as college secretary.
The grievance was denied, and Leone did not appeal the denial.

Leone and other secretaries complained to Shevell about

Brevetti in September 2002 after Giamundo was taken to the hospital following an incident with Brevetti on September 4. Leone also contacted the OEO in September 2002 in order to complain about Brevetti. She was told to file a formal complaint.

On September 30, 2002, Leone was sitting in a chair next to a large waste receptacle when Brevetti walked past her several times and glared at her. He returned past several other waste receptacles with his hands full of garbage, including a metal coffee can, and threw the garbage into the waste basket from a distance of six feet, missing the woman's head by inches.

Leone made a formal complaint of discrimination to the OEO alleging sexual harassment and retaliation by Brevetti on September 30, 2002 with respect to both the microphone incident and the waste receptacle incident. Brevetti was removed in November 2002 and replaced by AP Burgess.

After Burgess replaced Brevetti as the secretaries' supervisor, Leone states that her workload changed, increasing in some respects and decreasing in others. In addition, Burgess monitored her more closely and sought to know where she was at all times. In November 2002, Ken Trell, a consultant at Van Buren, told Leone to teach two school aides how to print out labels for time cards. He told her that if she did not like it, she could file a grievance. As he said this, he backed her up against a wall, touching her physically. Leone's blood pressure

- 12 -

rose. She went to the medical office and thereafter was taken
home by her husband. Leone complained to Shevell about this
incident, and Shevell told her to file a grievance. Leone also
contacted her union regarding the incident and was again told to
file a grievance. Leone never filed a grievance about this
incident, but she states that that is because she had been
informed by another secretary that Shevell would harass her and
make her life difficult if she complained and that she might as
well leave because there was no way she could prevail.

Starting on November 1, 2002, Leone kept a harassment log at
the suggestion of Thomas Fox, the LEOC for the Queens High School
Superintendency. At the same time she did not file any complaints
with Shevell, her union, or the OEO regarding the incidents she
listed in the log. On February 28, 2003, Leone filed a Charge of
Discrimination with the U.S. Equal Employment Opportunity
Commission alleging sex discrimination and retaliation.

Shortly after Giamundo was excessed from Van Buren, Leone
became dizzy and nauseous, and fell in her bedroom. She spoke to
Thomas Fox seeking transfer because of the manner in which she
was being treated. Fox told her not to transfer and that things
would be better now that the other women had left the school.
Leone elected to take an unpaid leave of absence until April
2004, at which point she retired.

Leone submitted claims to her union requesting disability

benefits for the time she was on approved leave of absence without pay and stated on the forms that her illness was not job related.

## Plaintiff Worrell's Contacts with Defendants Brevetti and Shevell

Plaintiff Worrell, an African American female, started working as a paraprofessional in the English Department at Van Buren in 1989. When Brevetti started working at Van Buren, Worrell had limited contact with him. In the spring of 2001, Worrell began doing per session work in the payroll office where she assisted Brevetti and Giamundo.

Worrell does not complain of any incidents until April 2, 2002, when Worrell informed Brevetti that she was applying for her secretarial license, and Brevetti told her she had to "blow him" if she wanted a secretarial position in the building. He began laughing. She told him he was disgusting and walked away. Leone witnessed this incident. Worrell testified that at that time, she did not know if he was serious or not. After the April 2002 incident, Brevetti again said "blow me" to her when she asked him to sign a supply request form.

On another occasion in the Spring of 2002, Worrell went to Brevetti's office to request a signature. When she tried to hand him the document, he told her, "shut up. I am not ready to sign yet...I'll throw you on the desk and bang you." Worrell told Giamundo about this incident.

In May 2002, Brevetti interrupted a conversation that
Worrell and Giamundo were having about a wedding Worrell had
attended. He asked whether they only served fried chicken and
watermelon, and began laughing.

Later that Spring, Brevetti again told Worrell he would
throw her over his desk and bang her when she went to his office
to ask him to approve payroll. Worrell again told Giamundo about
this incident, but Giamundo told her that complaining to Shevell
would not help.

On October 4, 2002, Worrell made a formal complaint to the
OEO alleging race discrimination and harassment by Brevetti.
After she filed the complaint, she met with Thomas Fox and Rona
Freiser from the UFT and discussed her allegations with them. As
mentioned above, Brevetti was removed from Van Buren in November
2002.

Worrell alleges that after she made her formal complaint,
she was told by her immediate supervisor, AP Brian Shea, to stay
out of the payroll office. She was thereafter accused of stealing
or manipulating timecards and denied the position of assistant
cheerleading coach.

Worrell requested transfer out of the school after Giamundo
and Singer were excessed; however, she was not transferred. She
then applied for and was granted leaves of absence without pay
due to stress-related migraine headaches for the periods February

3, 2003 to June 27, 2003; September 2, 2003 to February 5, 2004;
and February 4, 2004 to June 25, 2004. However, she thereafter
applied for a leave of absence for the period September 7, 2004
to February 4, 2005, which was not approved. She alleges she was
constructively terminated in February 2003 because she could not
return to Van Buren due to the increased migraine headaches and
the treatment that she was receiving at the hands of Principal
Shevell.

Worrell submitted Disability Claim forms to her union
requesting disability benefits for the time she was an approved
leave of absence without pay and stated on the forms that her
illness was not job related.

Plaintiff Singer's Contacts with Defendants Brevetti and Shevell

Plaintiff Singer began working with Brevetti when he was
assigned to Van Buren in her capacity as principal's secretary.
In September 2001, Brevetti instructed Singer to "blow me" for
the first time when Singer called Brevetti on the phone to tell
him he was late for a meeting. Brevetti also said "blow me" to
Singer on two other occasions during the Fall 2001 school term.
Singer told Brevetti to stop because it was disgusting.

In April 2002, Brevetti said "blow me" to Singer on two
occasions. She again told him to stop. Singer testified that she
did not complain to Shevell at the time because she had
previously heard Shevell laugh when Brevetti said "blow me" to

Giamundo in front of two other administrators, and therefore did
not think complaining to Shevell would help.

In June 2002, when Singer arrived at school the day after an
incident involving Giamundo and Brevetti, Principal Shevell
stated to Singer, "I was so afraid that he was going to hit her."
On September 5, 2002, the day after Giamundo went to the hospital
due to Brevetti's behavior, Singer informed Shevell about the
comments Brevetti had made to her in the Fall of 2001 and Spring
of 2002. Singer also complained to Don Nobles.

Nobles called an emergency secretaries meeting on September
6, 2002 and informed them that due to budgetary reasons, a
secretary was going to be excessed. Nobles asked for volunteers.
When nobody volunteered, he informed them that because Singer had
the least seniority, she would likely be the one to be excessed.
Singer was not, in fact, excessed at that time. On October 4,
2002, Singer submitted a formal complaint to the OEO alleging
sexual harassment by Brevetti.

Singer alleges that in the Fall of 2002, she received less
work from Shevell and had to ask permission to leave her desk
from AP Burgess or Trell. She was also she felt being monitored
by the other Assistant Principals and timed when she left her
desk, went to the bathroom, or engaged in other activities. She
found Brevetti to be stern and intimidating. Singer also
complains that she was not allowed to lock a cabinet in her

office to secure her belongings; that items she posted on a bulletin board were removed; that Shevell placed a sign on the door between Singer's office and Shevell's office saying "keep closed"; that a set of keys to Shevell's file cabinets that she left in her desk (as opposed to in a closet in Shevell's office, where the keys were supposed to be kept), went missing; and that, starting in the Fall of 2002, she lost opportunities to earn per session pay she had previously enjoyed.

In November 2002, Singer met with Thomas Fox and Rona Freiser about her LEOC complaint. The next day, Brevetti was removed from Van Buren. Singer never filed another complaint alleging retaliation. She informed UFT representatives about the retaliation, but believed that they would not support her.

Singer testified that she did not think Brevetti was asking for sexual favors when he said "blow me." She also testified that he also treated male staff members and other female staff members in a dismissive and intimidating manner; however, he never said "blow me" to male staff members.

Singer was excessed from Van Buren in January 2003 and assigned to Campus Magnet High School, where she is currently employed. In February 2003, Singer filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination on the basis of sex and retaliation.

Action Taken with Regards to Plaintiffs' Complaints

In addition to the complaints discussed above, the
secretaries at Van Buren met with Principal Shevell on September
20, 2002 in Singer's office and complained how Brevetti treated
them. In September 2002, Brevetti was removed from his
supervisory position as a result of the complaints; however, he
continued to work with and supervise Giamundo.

On September 23, 2002, Leone contacted the OEO and spoke
with Michael Valente concerning Brevetti's verbal harassment of
the secretaries. Valente counseled Leone that OEO could review
her complaints if a formal complaint was filed, and directed her
to the OEO website for Chancellor's Regulation A-830 and the
necessary complaint forms.[4] On October 2, 2002, Valente contacted
Adrienne Brown, the LEOC for Van Buren, and informed her of
Leone's verbal complaints. Brown informed Valente that she was
aware that numerous secretaries had made complaints concerning
Brevetti, that a meeting had been held with the secretaries,
union representatives and school officials, and that Brevetti had
been removed as the secretaries' direct supervisor.

As discussed above, between September 30 and October 4,
2002, the four named plaintiffs in this action filed formal
complaints of discrimination with the OEO. Valente contacted

---

[4] Chancellor Regulation A-830 of the New York City Department of
Education establishes the complaint procedure and internal review process of
complaints of discrimination or harassment.

Principal Shevell and requested a response to the allegations. On
October 7, 2002, Shevell responded to Valente, stating that in
June 2002, she requested Brevetti and Giamundo, who were having a
verbal altercation, to stop the altercation immediately. She also
stated that on September 13, 2002, she met with Giamundo and
resolved the first grievance, she referred Giamundo to the LEOC
since the second grievance was essentially an LEOC complaint. She
also met with the secretaries on September 25, 2003 to address
their concerns regarding Brevetti. She stated that as a result of
this conference, she removed Brevetti as the secretaries'
supervisor and selected a female Assistant Principal, Celeste
Burgess, to replace him.

On October 10, 2002, Valente sent plaintiffs' complaints to
Thomas Fox, the LEOC for the Queens High School Superintendency,
for investigation. Valente also informed John Lee, the
Superintendent for Queens High School, of the plaintiffs'
complaints and the LEOC investigation. Giamundo sent a memorandum
and exhibits to John Lee, but received no response.

On October 11, 2002, Steven Barkan, Giamundo's attorney,
wrote a letter to the OEO concerning Giamundo's complaints of
harassment and retaliation and requesting interim protection from
the harassment and retaliation pursuant to Regulation of the
Chancellor, No. 6. On October 25, 2002, the OEO responded to
Barkan's letter and informed him that Principal Shevell had

removed Brevetti from his supervisory position over the
secretaries. However, as already noted, Brevetti continued to
supervise Giamundo. The OEO also informed Barkan that the LEOC
investigation concerning Giamundo's complaint would be overseen
by the OEO.

In November 2002, Brevetti was removed from Van Buren;
however, plaintiffs testified that his removal was not a result
of the investigation concerning Giamundo's LEOC complaint, but of
an investigation pertaining to Brevetti's handling of per session
monies. On November 22, 2002, Barkan again wrote to LEOC
Complaint Officer Valente concerning Giamundo's complaints of
retaliation by Shevell, and on December 12th, he wrote to Valente
concerning Worrell, Leone, and Singer as well.

Plaintiffs contend that Valente did not investigate any of
the allegations against Shevell. While Valente and Shevell
discussed the reduction of secretaries from twelve to nine, and
the excessing of three secretaries, he did nothing to verify
Shevell's contention his decision was non-discriminatory. Shevell
provided Valente with "generic" job descriptions of the
secretaries' positions. She further informed Valente that in
response to Giamundo's grievance filed on November 22, 2002, the
requested furniture as well as assistance of a school aide for
two hours per day were provided to Giamundo. Valente did not
inquire why it took until November (when the school semester

started in September) for the furniture to be replaced.

On December 23, 2002, the OEO informed Barkan of its
conclusion that there was no violation of Chancellor's Regulation
A-830 as the evidence presented did not sufficiently establish
unlawful retaliatory conduct by Shevell. On May 9, 2003, Fox
formally informed Valente of his finding that there was no
hostile work environment, quid pro quo harassment, or
discrimination based on gender. However, in pursuing the
investigation, the OEO and LEOC failed to interview the
complainants, interview witnesses, and provide a timely report
with witness' statements. On May 12, 2003, the OEO
administratively closed the plaintiffs' cases.

## DISCUSSION

### Jurisdiction

This Court has jurisdiction over this action pursuant to 28
U.S.C. § 1331, which creates jurisdiction over civil actions
arising under federal law; 28 U.S.C. § 1343, which creates
jurisdiction over actions arising under 43 U.S.C. § 1983; and 28
U.S.C. § 1367, which creates supplemental jurisdiction over
claims arising under state law.

### Summary Judgment Standard

A court must grant a motion for summary judgment if the
movant shows that "there is no genuine issue as to any material
fact" and that "the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. PRO. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). The non-moving party must produce more than a scintilla of admissible evidence that supports its position.

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## Defendants' Summary Judgment Motions

Plaintiffs allege violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"),[5] 42 U.S.C. § 1983,[6] the New York State Human Rights Law, New York Executive Law §§ 296[7] and 297[8] ("NYSHRL"), and the New

---

[5] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

[6] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

[7] N.Y. Exec. Law § 296 provides:
It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in

York City Human Rights Law, N.Y.C. Administrative Code § 8-101 et

seq. ("NYCHRL")[9]. Specifically, (1) plaintiffs claim that

defendants discriminated against them by creating a hostile work

environment based on gender; (2) plaintiffs claim that defendants

retaliated against them for complaining about the alleged sexual

harassment and hostile work environment;[10] (3) plaintiffs Worrell

and Leone allege that they were constructively discharged by

defendants; and (4) plaintiff Giamundo alleges a cause of action

for defamation against defendants Blum and Shevell.

*Title VII*

**City Defendants' Motion for Summary Judgment**

The City Defendants argue that plaintiffs' Title VII claims

must be dismissed as to the individual defendants because Title

---

terms, conditions or privileges of employment.

...

(e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

   [8] N.Y. Exec. Law § 297(9) provides, "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages...."

   [9] New York City Administrative Code § 8-107 provides: "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Code § 8-107(1)(a).

   [10] Plaintiff Singer asserts no claim against defendant Brevetti.

VII claims cannot be maintained against individual defendants.[11]

It is well settled that an employer's agents, even those in supervisory positions, cannot be held individually liable under Title VII. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312-13 (2d Cir.1995), *abrogated on other grounds by, Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742; *Woods v. Ruffino*, 8 Fed.Appx. 41, 42 (2d Cir.2001); *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003). Accordingly, the Title VII claims must be dismissed as to the individual defendants.

**Defendant Brevetti's Motion for Summary Judgment**

Defendant Brevetti also argues that he is entitled to summary judgment on plaintiffs' Title VII claims against him because he may not be held individually liable under Title VII.[12] For the reasons stated above, the Title VII claims against defendant Brevetti must be dismissed.

As a result, only the Title VII claims against defendant Department of Education remain.

*Hostile Work Environment*[13]

---

[11] Plaintiffs do not respond to this argument.

[12] Plaintiffs do not respond to this argument.

[13] "[E]mployment discrimination claims under Section[] 1983...are evaluated under the same analytical framework as those brought under Title VII." *Jessamy v. City of New Rochelle*, 292 F.Supp.2d 498, 511 n. 15 (S.D.N.Y.2003)(internal citations omitted). Moreover, liability for purposes of Title VII and New York State and City human rights laws is essentially identical. *Tomka,* 66 F.3d at 1304 n.4; *McCoy v. City of New York*, 131 F. Supp. 2d 363, 375-76 (E.D.N.Y.2001). Consideration of claims brought under New York State and City Human Rights Laws parallels the...framework applied to Title VII claims. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000);

The Supreme Court has interpreted Title VII to prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id*. at 21. "[H]arms suffered in the workplace are cognizable under Title VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive -- that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the 'objective' requirement], (2) that the plaintiff 'subjectively perceives' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) [the 'prohibited causal factor' requirement]." *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir.2001)(internal citations omitted).

**City Defendants' Motion for Summary Judgment**

The City Defendants argue that they are entitled to summary judgment on plaintiffs' hostile work environment claim because plaintiffs cannot make out a prima facie case of hostile work environment, plaintiffs have not demonstrated that the conduct

---

*Landwehr v. Grey Adver., Inc.*, 211 A.D.2d 583 (N.Y. App. Div. 1995).

occurred because of their sex, and the Department of Education promptly addressed plaintiffs' complaints. These arguments are addressed seriatim below.

First, City Defendants argue that plaintiffs cannot establish that the environment at Van Buren was severe or pervasive enough to support a claim of hostile work environment. The behavior plaintiffs complain about allegedly occurred from September 2001 to at least September 2002, and "considered as a whole, undermined plaintiffs' ability to perform their jobs...." *Dawson v. County of Westchester,* 373 F.3d 265, 274 (2d Cir.2004). Plaintiff Giamundo, for example, alleges that Brevetti made offensive remarks several times during the Fall of 2001, and on an almost daily basis in the Spring of 2002. Further, Giamundo alleges that in June 2002, Brevetti yelled at her and physically pressed her against a radiator. Giamundo also alleges that in September 2002, Brevetti yelled at her and pounded on her desk while leaning toward her. As a result of this incident, Giamundo alleges she was taken to the hospital and treated for trauma. Giamundo further alleges that in order to harass her, Brevetti removed furniture from her office and removed the assistance she was receiving in the payroll office. As a result of defendants' actions, Giamundo was forced to complain several times over the course of that year in writing and orally to Shevell, her union, and the OEO. I conclude that sufficient facts exist which would

permit a reasonable jury to find that Giamundo's ability to
perform her job was undermined.

Similarly, a reasonable jury could find that Leone's ability
to perform her job was undermined as a result of her work
environment. Like Giamundo, Leone complained on several occasions
about defendants' behavior. Moreover, after an incident with Ken
Trell, Leone's blood pressure rose to the extent that she had to
leave work early. Leone also alleges that as a result of her
treatment at Van Buren, she became dizzy and nauseous and fell in
her bedroom. Leone herself states that left her job at Van Buren
because of the treatment she endured. Plaintiffs Worrell and
Singer also allege that they were harassed by defendant Brevetti
on several occasions, and that they overheard Brevetti's
harassment of other individuals. Both allege that they filed
complaints as a result of their treatment, and Worrell alleges
that she experienced migraine headaches and was forced to leave
her job. Because a reasonable jury could find that plaintiffs'
ability to perform their jobs were undermined as a result of
their work environments, defendants' argument fails.

City Defendants argue next that the hostile work environment
claim must be dismissed because plaintiffs cannot demonstrate
that the hostility was gender related.

In a hostile work environment claim, the "harassing conduct
need not be motivated by sexual desire to support an inference of

discrimination on the basis of sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Although "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred," they must occur under circumstances under which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island*, 2003 WL 21143076, *2 (E.D.N.Y.2003); *see also Gregory,* 243 F.3d at 694-695.

Here, plaintiffs allege, among other things, that Brevetti repetitively instructed them to "blow me" or "eat me"; put a microphone down his pants in a fashion suggesting an enlarged penis; told plaintiff Worrell that he would throw her over his desk and "bang" [i.e., rape] her; handed plaintiff Giamundo a note that said that "he wanted to do her" and "what he wanted her to do with her mouth;" and he physically pressed Giamundo against a radiator while yelling at her.

City Defendants contend that plaintiffs admit that they did not perceive Brevetti's comments as request for sexual favors. However, at least some of the plaintiffs dispute this, saying that they did not know what he wanted. Moreover, even if Brevetti's comments were not taken as requests for sexual favors, a rational jury could find that they were made on the basis of the plaintiffs' gender.

Finally, City Defendants argue that the hostile work environment claims must be dismissed because the Department of Education promptly addressed plaintiffs' complaints.

> "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir.2004)....[A]n employer will...be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. *Petrosino*, 385 F.3d at 225. That defense requires the employer to show that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257.

*Fairbrother v. Morrison*, 412 F.3d 39, 49 (2d Cir.2005). "Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999). As stated above, Chancellor Regulation A-830 lays out the policy and complaint procedures for sexual harassment claims. City Defendants claim that the Department of Education has accordingly satisfied the first prong of the test, and that the second prong is also satisfied because plaintiffs unreasonably failed to avail themselves of the policies and procedures until late September 2002 or early October 2002, when

they all filed their formal complaints to the OEO.

Plaintiffs contend that defendants have not satisfied the first prong, because their investigation of the complaints was a "sham." Defendants are alleged to have removed Brevetti not because of plaintiffs' complaints, but because of his alleged malfeasance relating to per session monies. Further, plaintiffs contend that Fox's report was untimely filed and failed to include the entire investigative file as required. Finally, in conducting the investigation, Fox and Valente failed to perform several of the required steps, including interviewing complainants and witnesses.

I need not address plaintiff's arguments because I find that the defendant has not met its burden of showing that the plaintiffs unreasonably failed to avail themselves of any preventative or corrective opportunities provided by plaintiff. Before they filed their complaints with the OEO in late September or early October of 2002, the plaintiffs had complained to Brevetti or Shevell or had filed grievances regarding Brevetti's behavior, to no avail. For example, plaintiff Giamundo asked Brevetti to stop using the offensive language, complained to Shevell about Brevetti's behavior verbally, wrote a letter to Shevell about the June 2002 incident, and filed a grievance and wrote a letter to Shevell about the September 4, 2002 incident before filing her formal complaint with the OEO on October 4.

Giamundo also saw Shevell laugh when Brevetti directed her to
"blow me" in the Spring of 2002, and reasonably determined that
complaining would not help. Similarly, Leone spoke to a UFT
representative regarding the June 2002 incident and complained to
Shevell about Brevetti's behavior in September 2002 before filing
her formal complaint on September 30, 2002. Worrell complained
about Brevetti's behavior to other secretaries, but was told that
complaining would not help. Singer told Brevetti to stop making
the offensive comments, heard Shevell laugh when Brevetti told
Giamundo to "blow me," and complained to Shevell in early
September about Brevetti's behavior to no avail before filing her
formal complaint on October 4, 2002. Given the foregoing facts, a
rational jury could find that any failure by plaintiffs to avail
themselves of the Department of Education's protective and
corrective policies and procedures until late September or early
October 2002 was reasonable.

For the reasons stated above, City Defendants' motion for
summary judgment on plaintiffs' hostile work environment claims
is denied.

**Defendant Brevetti's Motion for Summary Judgment**

Defendant Brevetti also argues that plaintiffs' § 1983
hostile work environment claim must be dismissed because the
harassment complained of was not severe or pervasive, and it was
not gender-based. For the reasons stated above, and in light of

the fact that defendant Brevetti disputes that he ever said "any of the things attributed to him by the plaintiffs generally and Maria Giamundo in particular," defendant Brevetti's motion for summary judgment on plaintiffs' hostile work environment claims is also denied.[14]

*Retaliation*

To state a prima facie case of retaliation, plaintiff must show (1) that she was engaged in a protected activity, (2) that her employer was aware of that activity, (3) that she suffered an adverse employment decision, and (4) that there was a causal connection between the protected activity and the adverse decision. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). In *De Cintio v. Westchester County Medical Center*, 821 F.2d 111 (2d Cir.1987), *cert. denied*, 484 U.S. 965 (1987), the court explained that

> [p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986), or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1188-89 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985), or *directly* through

---

[14] Relying on *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1187 (7th Cir.1986), defendant Brevetti also argues that unlike in a Title VII hostile work environment claim, the focus of a § 1983 claim is whether the harassment, even if severe and pervasive, was intentional. Without otherwise addressing defendant's argument, I note that plaintiffs have provided sufficient facts for a rational jury to find that Brevetti's harassment was intentional.

> evidence of retaliatory animus directed against a
> plaintiff by the defendant.

*Id*. at 115 (emphasis in original). Once a plaintiff has
established a prima facie case of retaliation, the burden of
production then shifts to the defendant to state a "legitimate
non-discriminatory reason" for the action. If defendant offers
such a reason, plaintiff must then show that defendant's
proffered reason is pretextual, and that its actual reason was
retaliation. *Id*. This plaintiff may accomplish in either of two
ways. Plaintiff may persuade the court with direct evidence that
a discriminatory reason more likely than the proffered reason
motivated the employer's decision. Or, plaintiff may indirectly
show pretext by coming forward with evidence that the employer's
proffered explanation is not worthy of credence. *Texas Dep't of
Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Because
the establishment of a prima facie case alone raises an inference
of discrimination, *Meiri v. Dacon*, 759 F.2d 989, 996 (2d
Cir.1985), "[a] showing that a proffered justification is
pretextual is itself sufficient to support an inference that the
employer intentionally discriminated." *Ramseur v. Chase Manhattan
Bank*, 865 F.2d at 465. The result that a case may turn completely
on the issue of pretext follows from the system of proof
established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,
802 (1973):

> [I]f the plaintiff convinces the trier of fact that it is
> more likely than not that the employer did not act for
> its proffered reasons, then the employer's decision
> remains unexplained and the inferences from the evidence
> produced by the plaintiff may be sufficient to prove the
> ultimate fact of discriminatory intent.

*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 (2d

Cir.1988), *quoting Chipollini v. Spencer Gifts, Inc.*, 814 F.2d

893, 899 (3d Cir.), *cert. dismissed*, 483 U.S. 1052 (1987). Thus,

at the summary judgment stage, a plaintiff may preclude dismissal

of her claim by producing evidence from which a reasonable jury

could conclude that the legitimate reasons proffered by the

employer were pretextual.

**City Defendants' Motion for Summary Judgment**

The City Defendants argue that plaintiffs' retaliation

claims should be dismissed as a matter of law. I address each

plaintiff's claim of retaliation, in turn, below.

Plaintiff Giamundo alleges that she was retaliated against

for complaining about Brevetti because her assistant was removed

and her furniture was removed from her office. Defendant contends

that this claim fails because these decisions occurred prior to

the time when plaintiff filed the formal complaint with the OEO.

However, plaintiff had complained to Shevell and others about

Brevetti's behavior before these decisions were taken, and those

complaints constitute a protected activity. *See Kotcher v. Rosa*

*and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir.1992)

(finding internal complaint to company management was protected

under Title VII, noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint") (internal quotation marks omitted). City Defendants further argue, however, that the reason these decisions were taken was due to budget cuts. Once a defendant gives a legitimate, non-discriminatory reason for an employment action, the burden shifts to plaintiff to show that defendant's reason is pretextual. Plaintiff has not offered any evidence that defendant's reasons are pretextual. Accordingly, Giamundo's claim that she was retaliated against when her assistant and furniture were removed must fail.

Plaintiffs Giamundo and Singer also argue that they were retaliated against when they were excessed from Van Buren and, as a result, lost seniority as well as per session pay. The City Defendants contend that plaintiffs Giamundo and Singer cannot establish that the excessing was causally connected to their complaints. Although plaintiffs have not provided direct evidence of retaliatory animus, plaintiffs have alleged facts sufficient to convince a trier of fact that a causal connection existed given that the protected activity was followed closely by the allegedly retaliatory treatment, and her co-plaintiffs, who also engaged in the protected activity, were treated similarly. *See De Cintio*, 821 F.2d at 115. City Defendants finally contend that Giamundo's and Singer's excessing was due to budget constraints,

and that in January 2003, the school excessed three secretaries with the least seniority. In order to counter defendants' proffered non-discriminatory reason for the excessing, plaintiffs provide testimony that after plaintiffs' right to return to Van Buren expired, the defendants hired four additional secretaries. Because a rational jury could find the City Defendants' proffered reason to be pretextual, the motion to dismiss plaintiffs' Giamundo's and Singer's claims of retaliation must be denied.

Plaintiffs Worrell and Leone contend that they were retaliated against because they were monitored more closely after they made complaints and were constructively discharged. Whether being watched more closely constitutes an "adverse employment action" turns on the factual question whether a reasonable similarly situated individual would have been deterred from complaining as a result of defendants' actions. *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). "Whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006). As such, it is not appropriately resolved on a motion for summary judgment. Accordingly, Defendants' motion for summary judgment on plaintiffs Worrell's and Leone's claims of retaliation are denied.

*Constructive Discharge*

Plaintiffs Worrell and Leone also allege that they were constructively discharged from Van Buren. An employee is constructively discharged when his employer "deliberately [makes her] working conditions so intolerable that [she is] forced into an involuntary resignation." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998), *quoting Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). "To prove constructive discharge, plaintiff must show that a reasonable person subjected to the working conditions experienced by plaintiff would have felt compelled to resign." *Viera v. Olsten/Kimberly Quality Care*, 63 F.Supp. 2d 413, 418-419 (S.D.N.Y. 1999)(citations omitted). "The employee's subjective assessment of working conditions as 'intolerable' is insufficient...and merely difficult or unpleasant working conditions do not rise to the level of constructive discharge." *Viera*, 63 F.Supp. 2d at 418-419 (internal citations and quotations omitted). Constructive discharge occurs only where an employee is subjected to an unreasonable risk of physical harm, to significant verbal abuse, or is forced to accept significantly lower pay or inferior working conditions." *Ternullo v. Reno*, 8 F.Supp.2d 186, 191 (N.D.N.Y.1998).

**City Defendants' Motion for Summary Judgment**

Plaintiff Leone claims she was constructively discharged in

April 2004, and plaintiff Worrell alleges she was constructively discharged on September 7, 2004, well after Brevetti's removal from Van Buren. Plaintiffs have not alleged facts after Brevetti's removal sufficient to give rise to a claim that "a reasonable person subjected to the working conditions experienced by plaintiff[s] would have felt compelled to resign." Although plaintiff Leone applied for and received leave of absence without pay from February 2003 to April 2004 due to an alleged illness, the Disability Claim forms she filed with her union state that her illness was not job related. Similarly, although Worrell applied for and received several leaves of absence due to migraine headaches, her Disability Claim forms state that her illness was not job related. Accordingly, plaintiffs have not alleged facts sufficient for a rational jury to find that at the time of their alleged constructive discharge, they were subject to "unreasonable risk of physical harm, to significant verbal abuse, or [to] significantly lower pay or inferior working conditions." *Ternullo v. Reno*, 8 F.Supp.2d at 191. Accordingly, plaintiff Leone and Worrell's constructive discharge claims must be dismissed.

## Section 1983 Claims

**City Defendants' Motion for Summary Judgment**

The City Defendants next argue that plaintiffs' § 1983 claims must be dismissed because plaintiffs cannot establish

municipal liability under § 1983, and plaintiffs' § 1983 action
cannot be maintained against the individual defendants.

*§ 1983 Claim against New York City Department of Education*

Municipalities and other governmental bodies are "persons"
within the meaning of § 1983 and may be held liable for
violations of constitutional rights. *Monell v. New York City
Dep't of Social Srvcs.*, 436 U.S. 658, 689-94 (1978).  However, a
municipality cannot be held liable solely for the misdeeds of its
employees.  *Id.* at 694. Rather, "a plaintiff seeking to impose
liability on a municipality under § 1983 [must] identify a
municipal 'policy' or 'custom' that caused the [alleged] injury."
*Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397,
403, (1997).  In addition, it is well-settled that § 1983 "does
not impose liability upon a municipality...solely on the basis of
*respondeat superior*."  *Willner v. Town of North Hempstead*, 977
F.Supp. 182, 193 (E.D.N.Y. 1997) (citing *Monell*, 436 U.S. at
694). "[T]here must be proof of such a custom or policy in order
to permit recovery on claims against individual municipal
employees in their official capacities, since such claims are
tantamount to claims against the municipality itself." *Dwares v.
City of New York*, 985 F.2d 94, 100 (2d Cir. 1993).  Inadequacy of
training "may serve as the basis for § 1983 liability only where
the failure to train amounts to deliberate indifference to the
rights of persons with whom the [employees] come into contact.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

Here, plaintiffs have neither alleged nor proven a policy or custom of discrimination, and they have not responded to the City Defendants' argument that this claim must be dismissed as to the Department of Education. Accordingly, plaintiffs' § 1983 claims against the Department of Education are dismissed.

*Defendants Shevell and Blum*

City Defendants further argue that Defendants Shevell and Blum cannot be held individually liable under Section 1983. "To establish individual liability in a § 1983 action, a plaintiff must 'show that [an] official, acting under color of state law, caused the deprivation of a federal right.'" *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir.2005)(quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)). "[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir.2004). "Personal involvement, within the meaning of this concept, includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring." *Id*.

As to plaintiffs' hostile work environment claims,

plaintiffs have alleged sufficient facts that could lead a rational jury to find that Shevell was grossly negligent in her supervision of Brevetti. Plaintiffs complained on several occasions to Shevell about Brevetti's behavior, and Shevell witnessed his offensive behavior on more than one occasion. During one such occasion, when Brevetti said "blow me" to Giamundo, Shevell even laughed. Accordingly, Shevell's motion to dismiss this § 1983 claim as against her must be denied. The only retaliation claim that remains is Giamundo's claim that she was retaliated against when she was excessed from Van Buren. Because plaintiffs have testified that Shevell directly participated in Giamundo's excessing, the motion to dismiss this § 1983 claim as against Shevell must also be denied. Because the constructive discharge claims must be dismissed, I need not address whether these § 1983 claims should be dismissed as to Shevell.

The only facts in the record relating to defendant Blum concern his "humiliating" search and removal of Giamundo from her position at Van Buren. There are no facts to suggest that Blum was involved in creating a hostile work environment, retaliating against defendants for engaging in a protected activity, or constructively discharging plaintiffs Worrell or Leone. Because Blum's removal of Giamundo is a fact related to only plaintiff Giamundo's common law defamation claim, the § 1983 actions against defendant Blum must be dismissed.

*State Law Claims*

**Defendant Brevetti's Motion for Summary Judgment**

Defendant Brevetti argues that plaintiffs' state law claims should either be dismissed or the Court should decline to exercise jurisdiction over them. First, Brevetti argues that under the NYSHRL, individuals may only be held liable for creating a hostile work environment if they have significant supervisory authority, which Brevetti did not have. Next, defendant Brevetti argues that even though he is subject to liability under the NYCHRL, the hostile work environment claim should be dismissed for the reasons previously argued. Finally, Brevetti argues that "in any event, this Court should decline to exercise jurisdiction over claims founded if at all on the New York City administrative Code in the absence of instructive authority." Presumably, defendant Brevetti is referring to the authority of district courts to dismiss pendant state law claims when the federal claims have been dismissed.

As an initial matter, I note that I have denied the City Defendants' motion to dismiss plaintiff Giamundo's retaliation claim, and I have denied Brevetti's motion to dismiss the hostile work environment claim.[15] As a result, at least some federal

---

[15] Although defendant Brevetti purports to have moved for summary judgment "on all claims," he does not, in his moving papers, address the retaliation or constructive discharge claims; he addresses only the hostile work environment claims. However, because, as stated above, I conclude that several of the retaliation claims and all of the constructive discharge claims must be dismissed as a matter of law, those claims are also dismissed as

claims against Brevetti remain, and this Court accordingly
retains pendant jurisdiction over the state law claims. Moreover,
those discrimination claims under the NYCHRL remain, as Brevetti
does not dispute that he is subject to liability under the
NYCHRL.

Brevetti's remaining argument, that he cannot be held
individually liable under the NYSHRL also fails. Brevetti argues
that New York State's Human Rights Law permits personal liability
only when the individual has an "ownership interest" or "the
power to do more than carry out personnel decisions made by
others." *Tomka*, 66 F.3d at 1317. Because, he argues, he did not
have the power to hire or fire any of the plaintiffs, he cannot
be held personally liable under the NYSHRL.

However, ownership interest and the power to make personnel
decisions are only one ground for personal liability under the
NYSHRL. An individual may also be held personally liable if he
"actually participate[s] in the conduct giving rise to [the]
discrimination." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir.
2004)(quoting *Tomka*, 66 F.3d at 1317). In the present case,
whether or not Brevetti actually participated in discriminatory
conduct is a disputed issue of fact. Accordingly, summary
judgment is not appropriate on this claim.

---

against defendant Brevetti.

**CONCLUSION**

For the aforementioned reasons, defendants' motions for summary judgment are granted in part and denied in part.

The Clerk is directed to transmit a copy of the within to all parties and to the magistrate judge.


SO ORDERED.

Dated:     Brooklyn, New York
           September 20, 2006


                    By:  <u>/s/ Charles P. Sifton (electronically signed)</u>
                         United States District Judge